# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**MICHAEL DRESCHER**
        **Plaintiff,**

   v.                                                                               **Case No. 10-C-0185**

**BABY IT'S YOU, LLC, et al.,**
        **Defendants.**

## DECISION AND ORDER

Plaintiff Michael Drescher brings this action against defendants Baby It's You, LLC, Floyd Mutrux, Northern Lights, Inc., Jonathan Sanger and Joncar Productions, Inc., alleging securities fraud and related claims arising out of plaintiff's investment in a series of theatrical productions. In lieu of an answer, defendants filed a motion to stay or dismiss this action and compel arbitration,[1] a motion to dismiss for lack of personal jurisdiction, and an alternative motion to transfer venue to the Central District of California. In his response brief, plaintiff indicated that he had no objection to transferring this action to the Central District of California, thus mooting defendants' motion to dismiss based on personal jurisdiction and alternative motion to transfer venue. However, plaintiff argues that he never entered into an agreement to arbitrate the claims at issue in this suit, and that therefore defendants' motion to compel arbitration should be denied.

Because the parties have completed briefing on the motion to compel arbitration, I advised the parties that I would decide that motion before transferring the case to

---

[1] For ease of reference, I will refer to this motion simply as defendants' motion to compel arbitration.

California, and the parties did not object to this manner of proceeding. For the reasons stated below, the motion to compel arbitration will be denied.

## I. BACKGROUND

In July 2007, defendant Floyd Mutrux approached plaintiff and asked him to invest in a Broadway production that Mutrux was writing, tentatively entitled "The Shirelles." Plaintiff describes this production as a "jukebox musical" focusing on the professional life of The Shirelles, a 1950s singing group. On August 22, 2007, plaintiff and Mutrux entered into a written agreement – known as the "Shirelles Agreement" – in which plaintiff invested $200,000 in the venture in exchange for three percent of the net profits. The written agreement provided that all disputes arising out of it would be settled by binding arbitration. Shortly after making this investment, plaintiff learned that Mutrux had been using invested funds to pay his personal expenses. Plaintiff demanded that Mutrux account for the invested funds, but Mutrux refused to do so. Plaintiff did not take any legal action or initiate arbitration in connection with Mutrux's refusal.

Subsequent to these events, Mutrux formed Baby It's You, LLC ("BIY") and transferred his rights in "The Shirelles" to the company. Defendant Jonathan Sanger, through his company, Joncar Productions, Inc., began conducting the business of BIY. Sanger's initial task was to raise capital to produce "The Shirelles" and several other Broadway productions. To this end, Sanger (along with Mutrux) urged plaintiff to invest additional funds in BIY's projects. After receiving various assurances from both Sanger and Mutrux about the ways in which his investment would be used, plaintiff planned to invest $600,000 in three of BIY's productions – "Boy From New York City," "Lonesome Town" and "Baby It's You" – by December 31, 2008. Plaintiff also planned to invest an

2

additional $400,000 in these projects and a fourth project, "Heartbreak Hotel," by the end of January 2009.

On December 29, 2008, plaintiff sent Sanger an email proposing terms for his investment in the four musicals. Among other things, plaintiff's proposal stated that he agreed that "arbitration practices" would be "thoroughly exhausted before engaging legal I [sic] any matters of dispute." (Drescher Decl. Ex. B at p.4.) On December 30, 2008, Sanger responded via email with a counteroffer. Sanger suggested that plaintiff raise his initial investment from $600,000 to $700,000 and also suggested changes to the language of various provisions of the proposal, including the arbitration clause. Under Sanger's proposal, the arbitration clause stated that plaintiff "agrees to 'arbitration' practices to be used in any matters of dispute as outlined in Paragraph 10 of the original 'SHIRELLES' agreement between [plaintiff] and [Mutrux]." (Mot. to Compel Arbitration, Ex. 2.)

Upon receipt of Sanger's counteroffer, plaintiff sent Sanger an email from his mobile phone stating, "Got it, thanks!" (Id.) Plaintiff states that his intent in sending this email was merely to acknowledge that he received Sanger's counteroffer, and that he did not intend his response to indicate that he accepted the counteroffer. (For his part, Sanger has not submitted an affidavit or other evidence indicating that he understood plaintiff's email as an acceptance.) Moreover, plaintiff states that at the time he sent his email he was aware that Sanger was in the process of preparing an operating agreement for BIY. Plaintiff states (and Sanger does not dispute) that Sanger "repeatedly" told plaintiff that their "arrangement" would not be concluded until plaintiff signed this operating agreement. (Drescher Decl. ¶ 8.)

On December 31, 2008, plaintiff wired $600,000 to BIY's bank account. Plaintiff states that he did this even though no formal contract had been finalized because, for tax purposes, he needed to make his investment by the end of the calendar year and he was confident that the parties were close to concluding a final, written agreement. However, plaintiff does not state that he communicated this fact to Sanger or any other defendant. Nonetheless, no defendant submits an affidavit or other evidence indicating that defendants considered plaintiff's act of wiring $600,000 as an acceptance of Sanger's counteroffer.

Plaintiff's belief that the parties were close to reaching a final agreement turned out to be mistaken. Sanger did not send plaintiff a proposed written contract until March 26, 2009. Upon reviewing the contract, plaintiff determined that it did not contain the assurances that Sanger and Mutrux had made to plaintiff in order to convince him to once again invest in Mutrux's projects. This caused plaintiff to conclude that he had been "had" and that defendants did not intend to honor the assurances they had made to him. (Drescher Decl. ¶ 10.) Plaintiff demanded that defendants return the $600,000 investment, and when they refused, he filed this lawsuit. As noted, defendants then moved to compel arbitration.

## II. DISCUSSION

Under the Federal Arbitration Act, 9 U.S.C. §§ 1-16, a court may compel arbitration if the party demanding arbitration shows the following elements: (1) the existence of a written agreement to arbitrate; (2) the parties' dispute falls within the scope of the arbitration agreement; and (3) a refusal to arbitrate. <u>Zurich Am. Ins. Co. v. Watts Indus., Inc.</u>, 417 F.3d 682, 687 (7th Cir. 2005). As the first two of these elements reflects,

arbitration is contractual by nature and a party cannot be required to submit a dispute to arbitration that it did not agree to submit. Id. Thus, when a party moves to compel arbitration, the court must first decide whether the parties entered into a written agreement to arbitrate. Sphere Drake Ins. Ltd. v. All Am. Ins. Co., 256 F.3d 587, (7th Cir. 2001) ("[C]ourts, rather than arbitrators, usually determine whether the parties have agreed to arbitrate.").

Plaintiff does not dispute that he agreed to arbitrate any dispute arising out of the Shirelles Agreement – that is, any dispute arising out of his initial $200,000 investment in "The Shirelles." However, plaintiff insists that he is not pursuing any claims based on Mutrux's breach of the Shirelles Agreement and alleged misuse of the $200,000 investment. Rather, plaintiff states that his claims are based on his $600,000 investment in BIY's other musicals, and that because no written agreement was concluded in connection with this investment he cannot be compelled to arbitrate. Defendants do not dispute that the present suit is not covered by the arbitration clause in the Shirelles Agreement, but they argue that plaintiff agreed to arbitrate any dispute arising out of his subsequent investment in BIY during his email communications with Sanger. Thus, the issue in the present case is whether the parties' conduct resulted in the formation of a written agreement to arbitrate any dispute involving the $600,000 investment.

When determining whether the parties entered into a written agreement to arbitrate, courts apply state-law principles of contract formation. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995); Hill's Pet Nutrition, Inc. v. Fru-Con Constr. Corp., 101 F.3d 63, 65-66 (7th Cir. 1996). In the present case, the parties do not raise a dispute over which state's law applies, and therefore I will apply Wisconsin law by default. See Wood

5

v. Mid-Valley, Inc., 942 F.2d 425, 426-27 (7th Cir. 1991) (stating that where parties do not raise a conflict-of-law issue court will simply apply law of state in which district court sits).

In Wisconsin, as in most states, a contract is not formed unless one party accepts the other's offer. See, e.g., Am. Nat'l Prop. & Cas. Co. v. Nersesian, 277 Wis. 2d 430, 441 (Ct. App. 2004). "[I]n order for acceptance of a contract to occur, there must be a meeting of the minds, a factual condition that can be demonstrated by word or deeds." Zeige Distrib. Co., Inc. v. All Kitchens, Inc., 63 F.3d 609, 612 (7th Cir. 1995) (Wisconsin law). In arguing that the parties agreed to arbitrate the present dispute, however, defendants do not attempt to show that the parties reached a meeting of the minds. To be sure, defendants compile a list of facts and then assert in conclusory fashion that these facts "indisputably" show that plaintiff agreed to arbitrate the present dispute. (Reply Br. at 2-3.) However, defendants make no attempt to show that the recited facts add up to a meeting of the minds under Wisconsin (or any other state's) law. And after reviewing the recited facts along with the facts contained in plaintiff's declaration, I conclude that the facts do not, as a matter of law, establish that the parties formed a contract to arbitrate the present dispute.

As noted, plaintiff initially proposed that the parties include an arbitration clause in their deal when he emailed a list of terms to Sanger on December 29, 2008. This could be construed as an offer. However, Sanger did not accept this offer. Instead, he made a counteroffer, which under Wisconsin law constituted a rejection of plaintiff's offer and the making of a new offer. Farmer v. Pick Mfg. Co., 227 Wis. 99, 101 (1938). When plaintiff received Sanger's counteroffer by email, he immediately replied by email and stated, "Got it, thanks!" Plaintiff states that he wrote this email merely to acknowledge receipt of

6

Sanger's email, and defendants do not contend that they understood plaintiff's note as an acceptance of their counteroffer. Nor would any reasonable person interpret plaintiff's note as an acceptance. Although plaintiff also wired $600,000 to defendants, defendants do not submit an affidavit or other evidence indicating that they understood this act as an acceptance of their counteroffer. Further, defendants do not dispute that they informed plaintiff that the parties' arrangement would not be concluded until a formal operating agreement for BIY was executed. And when parties agree to preliminary terms with the understanding that such terms will not be binding until the parties sign a formal, written agreement containing other essential terms, the preliminary agreement is not treated as an enforceable contract. See PFT Roberson, Inc. v. Volvo Trucks N. Am., Inc., 420 F.3d 728, 729-33 (7th Cir. 2005) (Illinois law); Skycom Corp. v. Telstar Corp., 813 F.2d 810, 814-17 (7th Cir. 1987) (Wisconsin law); Lambert Corp. V. Evans, 575 F.2d 132, 135 (7th Cir. 1978) (Wisconsin law); Garrick Theater Co. v. Gimbel Bros., Inc., 158 Wis. 649, 656 (1914); Goldstine v. Tolman, 157 Wis. 141, 155-56 (1914). Here, the parties never executed the contemplated operating agreement for BIY, and thus the evidence in the record does not establish that the parties formed a contract.[2]

---

[2]Had defendants submitted an affidavit or other evidence in which they stated that they considered plaintiff to have accepted their counteroffer when he wired the funds, and in which they disputed plaintiff's assertion that the parties did not intend to be bound until they executed the operating agreement for BIY, I likely would have determined that an evidentiary hearing (or, possibly, a jury trial) was needed to resolve genuine issues of material fact. See 9 U.S.C. § 4 (stating that parties are entitled to evidentiary hearing or jury trial when the "making of the arbitration agreement" is in issue). However, because defendants have decided not to contradict the facts as presented in plaintiff's declaration and have not demanded an evidentiary hearing or jury trial in connection with their motion, I have simply accepted plaintiff's version of the facts as true.

Although defendants seem to concede that the parties never formed a complete agreement, they contend that the parties at least reached a meeting of the minds concerning arbitration. Citing Prima Paint Corp v. Flod & Conklin Manufacturing Co., 388 U.S. 365 (1967), a case in which the Supreme Court held that an arbitration clause could be enforced even though the contract in which it appeared may have been procured by fraud, defendants point out that an arbitration clause is severable from the contract to which it applies. Defendants then argue that parties may bind themselves to arbitrate a dispute over an agreement even though they have not yet finalized that agreement. This proposition is true enough, but not because of Prima Paint. Rather, the common law of contracts provides that contracting parties, as masters of their own affairs, are always free to enter into binding preliminary agreements and leave other matters to be resolved at a later date, whether the preliminary agreement involves arbitration or some other aspect of the parties' deal. See PFT Roberson, 420 F.3d at 730 ("If people choose to negotiate and agree item by item, that is their privilege.") But of course, the fact that it is legally possible to agree to arbitration with respect to a transaction even before the details of the transaction are worked out does not mean that the parties in the present case actually entered into such an agreement. Defendants must still submit evidence establishing that the parties understood that they had bound themselves to arbitration even though the rest of their deal was up in the air. However, no such evidence appears in the record.

Defendants' argument seems to be that because plaintiff included an arbitration clause in his offer and Sanger included a similar clause in his counteroffer, the parties reached a meeting of the minds on this point and intended to be bound. However, I am aware of no case holding that when parties exchange offers they are bound by any terms

that appear in both offers, even though neither offer was accepted. Moreover, even assuming that the appearance of the arbitration clause in both offers signaled that both parties were amenable to arbitration, this does not mean that they had agreed to immediately bind themselves to arbitration while they worked out the rest of their deal. The Seventh Circuit's opinion in PFT Roberson is instructive on this point:

> Often the parties agree on some items (such as how many trucks the buyer wants) while others (such as the price) require more negotiation. If any sign of agreement on any issue exposed the parties to a risk that a judge would deem the first-resolved items to be stand-alone contracts, the process of negotiation would be more cumbersome (the parties would have to hedge every sentence with cautionary legalese), and these extra negotiating expenses would raise the effective price (for in a competitive market the buyer must cover all of the seller's costs).

420 F.3d at 731 (citation omitted). Although PFT Roberson involved Illinois law, the court recognized that the law in other jurisdictions is no different, id. at 732, and in any event cases such as Skycom, Lambert, Garrick and Goldstine confirm that Wisconsin courts do not hold that once parties evince agreement on some terms of a contract they are bound by those terms even though other essential terms remain to be negotiated. Again, if there is some evidence that the parties intended to be bound by their preliminary agreement, then a stand-alone, binding contract may have been formed. But where, as here, there is no evidence that the parties intended to structure their transaction through the use of a series of stand-alone contracts, a preliminary agreement on certain terms is not binding.

Accordingly, defendants have not satisfied their burden to prove that the parties entered into a written agreement to arbitrate the claims pleaded in plaintiff's complaint, and therefore defendants' motion to compel arbitration will be denied. However, pursuant to

the parties' agreement, I will transfer this case to the Central District of California for further proceedings.

## III.  CONCLUSION

For the reasons stated, **IT IS ORDERED** that defendants' motion to dismiss or stay this case and compel arbitration is **DENIED**.

**IT IS FURTHER ORDERED** that, pursuant to the parties' agreement, defendants' motion to transfer this case to the United States District Court for the Central District of California is **GRANTED**.  The clerk of court shall take all steps necessary to complete the transfer.

Dated at Milwaukee, Wisconsin, this 13 day of September, 2010.

/s_____
LYNN ADELMAN
District Judge